UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

KEVIN L.[1],                                       )
                                                   )
          Plaintiff,                               )
                                                   )
v.                                                 )     CIVIL NO. 2:20cv311
                                                   )
KILOLO KIJAKAZI, Acting                            )
Commissioner of Social Security,                   )
                                                   )
          Defendant.                               )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for a period of

disability and Disability Insurance Benefits (DIB) under Title II of the Social Security Act. 42

U.S.C. § 423(a).  Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the

[Commissioner] shall file a certified copy of the transcript of the record including the evidence

upon which the findings and decision complained of are based.  The court shall have the power to

enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the [Commissioner], with or without remanding the case for a

rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by

substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to last for a continuous period of no less than 12

_____

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §423(d)(3).  It is not enough for a plaintiff to establish that an impairment exists.  It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity.  *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff.  *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings."  *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law."  *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2.      The claimant has not engaged in substantial gainful activity since January 5, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.      The claimant has the following severe impairments: degenerative disc disease of cervical, lumbar, and thoracic spine; status-post lumbar fusion; horizontal tear of the labrum of right shoulder with atrophy; chondral loss of the right knee; obesity; unspecified depressive disorder; generalized anxiety disorder; and post-traumatic stress disorder (PTSD) (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant can occasionally reach overhead with both upper extremities; frequently reach in all directions and handle with the bilateral upper extremities. The claimant can never climb ladders, ropes or scaffolds but can occasionally climb ramps and stairs; and occasionally balance, stoop, and kneel but never crawl or crouch. The claimant can never work at unprotected heights or around moving mechanical parts. Every 20 minutes, the claimant must be allowed to shift positions, or alternate between sitting and standing for 1-2 minutes at a time while remaining on task. The claimant must use a medically necessary cane at all times while walking. The claimant can never interact with the general public, but can occasionally interact with coworkers and supervisors. The claimant is limited to work that does not involve assembly line work or strictly enforced daily production quotas.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on September 10, 1974 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the

claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 5, 2016, through the date of this decision (20 CFR 404.1520(g)).

(Tr.17 -28).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits, leading to the present appeal.

Plaintiff filed his opening brief on May 14, 2021. On July 6, 2021 the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on August 11, 2021. Upon full review of the record in this cause, this court is of the view that the Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).   In the present case, Step 5 was the determinative inquiry.

On April 7, 2016, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging disability since January 5, 2016, the date of a workplace accident. (Tr. 15, 173.) His claims were denied initially and upon reconsideration. (Tr. 173.) Following a hearing, an ALJ issued an unfavorable decision. (Tr. 173-83.) The Appeals Council granted Plaintiff's request to review the ALJ's decision, and remanded the case back to the ALJ. (Tr. 189-92.) Following a second hearing, the ALJ again issued an unfavorable decision. (Tr. 15-28.) Plaintiff alleges disability due to: degenerative disc disease of the cervical, thoracic, and lumbar spine; status-post lumbar fusion; horizontal tear of the labrum of right shoulder with atrophy; chondral loss of the right knee; obesity; depression; anxiety; and PTSD. (Tr. 17-18, 359.)

In support of remand, Plaintiff first argues that the ALJ failed to properly evaluate the opinions from his examining physicians, Drs. Gupta, Nenadovich, and Nordstrom.  On December 4, 2018, R. Gupta, M.D., performed a consultative examination of Plaintiff. (Tr. 2333-37.) Dr. Gupta opined that Plaintiff was "unable to do work related activities," including sitting, standing, walking, lifting, carrying, and handling heavy objects "due to pain and stiffness throughout the back and sensations in the upper extremities." (Tr. 2336.) The ALJ afforded little weight to Dr. Gupta's opinion because it was "not consistent with the record." (Tr. 26.) Plaintiff contends that the ALJ erred by failing to provide a sufficient explanation for discounting this opinion. *See Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) ("[R]ejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled . . . can be expected to cause a

5

reviewing court to take notice and await a good explanation for this unusual step."). Plaintiff also asserts that the ALJ did not evaluate Dr. Gupta's opinion pursuant to 20 C.F.R. § 404.1527 as he was required to do.

Specifically, Plaintiff claims that the ALJ did not articulate whether, or how, he considered the examining relationship between Dr. Gupta and Plaintiff. *See* 20 C.F.R. § 404.1527(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you."). Plaintiff further claims that the ALJ failed to assess the evidence that Dr. Gupta provided in support of his opinion. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."). During the examination, Dr. Gupta documented lumbar flexion between 40 and 50 degrees (out of 90), lumbar extension between 15 to 20 (out of 25), and lateral flexion between 15 and 20 on the right and 10 to 15 on the left (out of 25). (Tr. 2337.) Dr. Gupta observed spinous and paraspinal tenderness in the thoracic and lumbar region, as well as numbness and tingling sensations in the bilateral upper extremities. (Tr. 2335.) Plaintiff was only able to generate 35.1 kg of force with his right hand, and 34 kg of force with his left hand on the dynamometer. (*Id*.) Dr. Gupta noted that Plaintiff's gait was "slow" and "wide-based" due to his obesity. (Tr. 2335.) He was unable to stoop and squat completely, and could not walk heel to toe tandemly. (*Id*.) He could "stand from a sitting position with difficulty." (*Id*.) Plaintiff argues that this examination supported Dr. Gupta's conclusions that Plaintiff would struggle with carrying out physical work activities on a full-time basis due to pain and stiffness in his back, and numbness and tingling in his upper extremities. (Tr. 2336.)

6

Plaintiff also argues that the ALJ failed to discuss the other evidence in the record that was consistent with Dr. Gupta's opinion. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). Medical records from other sources documented: spinal tenderness; limited and painful spinal range of motion; positive straight leg raising; spinal muscle spasms; sacroiliac joint tenderness; limited right shoulder range of motion; limited right shoulder strength; right shoulder impingement; positive O'Brien's test; pain with Jobe's test; positive Tinel's test; right elbow tenderness; right hand weakness; antalgic or slow gait; decreased sensation in the right hand; reduced hip range of motion; right hip tenderness and swelling; difficulty rising from a chair; limited right knee range of motion; and positive Spurling's test. (Tr. 497, 513, 515, 517, 519, 554, 558, 562, 578, 593, 1703-05, 1713, 1728, 1738, 1743, 1759, 1774, 1796, 1824, 1865, 1915, 2147.)

Additionally, consultative examining physician Bharat Pithadia, M.D., opined that Plaintiff had "significant" problems with his shoulders and back. (Tr. 1704.) He had a "significant" impairment in his activities of daily living. Dr. Pithadia concluded: "It appears it'll be months before any significant recovery can be expected to occur if it does." (Tr. 1705.) Thomas Ryan, D.O., opined that Plaintiff was unemployable due to physical restrictions and symptoms that would require him to miss work. (Tr. 2139.) Plaintiff's spinal surgeon, Nikola Nenadovich, opined that Plaintiff could not walk even one block before needing to rest or experiencing severe pain. (Tr. 2585.) In an 8-hour workday, he could sit, stand, or walk for less than 2 hours each. (*Id*.) Plaintiff contends that this evidence was consistent with Dr. Gupta's opinion and should have been discussed by the ALJ.

7

In response, the Commissioner admits that the ALJ "did not specify particular records with which Dr. Gupta's opinion is not consistent." The Commissioner asserts, however, that the ALJ referenced evidence of improved walking ability and normal gait. However, as Plaintiff points out, the record is clear that he often presented with a slow, unstable, antalgic, or abnormal gait. (Tr. 558, 578, 1703, 1713, 1728, 1738, 1743, 1759, 1865, 1915, 2149, 2335, 2533, 2545.) "An ALJ cannot rely only on the evidence that supports her opinion." *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013). Moreover, the Commissioner – like the ALJ - does not explain how evidence of normal gait and improved walking ability undermined Dr. Gupta's opinion regarding Plaintiff's ability to carry out other work tasks, such as sitting, standing, lifting, carrying, and handling heavy objects.

Clearly, the ALJ's assessment of Dr. Gupta's opinion fell well below the minimal articulation standard that is required. *See Aurand v. Colvin*, 654 Fed.Appx. 831, 837 (7th Cir. 2016); *Czarnecki v. Colvin*, 595 Fed.Appx. 635, 642 (7th Cir. 2015) ("Although an ALJ is not required to accept the views of an agency examining physician . . . the ALJ still must have a good explanation for rejecting or discounting the examining physician's opinion."). Here, the ALJ should have articulated how he considered the fact that Dr. Gupta, as a consultative examining physician chosen by the Agency, had the opportunity to personally examine Plaintiff. 20 C.F.R. § 404.1527(c)(1). The ALJ also failed to assess the evidence that Dr. Gupta offered in support of his opinion. 20 C.F.R. § 404.1527(c)(3). Dr. Gupta's examination revealed many abnormal findings, including limited lumbar range of motion, spinous and paraspinal tenderness, slow and wide-based gait, and difficulty rising from sitting to standing. (Tr. 2335-37.) Additionally, the ALJ failed to assess the evidence in the record consistent with Dr. Gupta's opinion. 20 C.F.R. § 404.1527(c)(4).

8

(Tr. 497, 513, 515, 517, 519, 554, 558, 562, 578, 593, 1703-05, 1713, 1728, 1738, 1743, 1759, 1774, 1796, 1824, 1865, 1915, 2139, 2147, 2585.) Thus, remand is required for a proper consideration of Dr. Gupta's opinion.

The Court will next consider arguments regarding Dr. Nenadovich's opinion. Dr. Nenadovich was Plaintiff's spinal surgeon and treating physician. ALJs must provide "good reasons" for discounting the opinion of a treating physician. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). Dr. Nenadovich issued an opinion in November of 2019 about Plaintiff's inability to work. (Tr. 2584-87.) Dr. Nenadovich opined that Plaintiff would be off-task at least 25 percent of the workday. (Tr. 2587.) He could not walk even one block before needing rest or experiencing severe pain. (Tr 2585.) He could sit for 10 to 15 minutes, and stand for 5 to 10 minutes at a time. (*Id*.) However, in an 8-hour workday, he could sit, stand, or walk for less than 2 hours each. (*Id*.) Plaintiff would need to walk around for 5-10 minutes, every 15 to 20 minutes to relieve his pain. (Tr. 2586.) He would require unscheduled breaks. (*Id*.) He could lift 10 pounds or less occasionally, and 20 pounds rarely. (*Id*.)

The ALJ afforded Dr. Nenadovich's opinion little weight, finding that it was "inconsistent with the record." (Tr. 26.) The ALJ cited to medical records of "improved walking ability," and noted that he "often had a normal gait." (*Id*.) However, as Plaintiff points out, he often presented with a slow, unstable, antalgic, or abnormal gait. (Tr. 558, 578, 1703, 1713, 1728, 1738, 1743, 1759, 1865, 1915, 2149, 2335, 2533, 2545.) The ALJ observed that Dr. Nenadovich's April 2019 examination showed normal gait, strength, and sensation. (Tr. 26, 2555-59.) However, in addition to abnormal gait, other medical records document limited shoulder strength; reduced lower extremity strength; and decreased grip strength. (Tr. 564, 593, 800, 1571, 1705, 1988, 2085.)

9

Plaintiff frequently presented with weakness. (Tr. 564, 576, 583, 857, 930, 1705, 1829, 1833, 1903, 2009, 2083.) Still other medical records document: decreased sensation in his right hand; abnormal sensation in his right arm, right leg, right foot, and left thigh; absent reflexes in the right ankle; numbness and tingling in his right hand, right shoulder, lower back, neck, and legs. (Tr. 553, 556, 576, 583, 588, 560, 600, 603, 654, 1703, 1740, 2037, 2333, 2335.) Plaintiff argues that the ALJ should have explained why the normal findings were more persuasive than the contrary evidence of abnormal gait, reduced or abnormal sensation, and decreased strength. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) ("[T]he ALJ erred in utterly failing . . . to explain the rationale for crediting the identified evidence over the contrary evidence . . . [T]he ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it.").

Additionally, the ALJ found that Dr. Nenadovich's opinion was undermined by Plaintiff's reported improvement following his spinal cord stimulator surgery. (Tr. 26, 2452-58, 2545-50.) However, the one medical record that the ALJ relied on stated that Plaintiff continued to experience back and right leg pain that was constant, and rated as a 6 out of 10 in severity. (Tr. 2545.) His pain continued to be aggravated by car rides, walking, and daily activities. (*Id.*) He reported sleep disturbance, weakness, urinary incontinence, and an unstable gait. (*Id.*) At the hearing, Plaintiff testified that he still suffered from excruciating back pain. (Tr. 72.) He described sharp, searing, throbbing, and crushing back pain that went from his back down into his leg and foot. (Tr. 77.) He was constantly uncomfortable. (Tr. 77.) Plaintiff contends that, although his condition may have improved following the insertion of his morphine pump (Tr. 2545), this improvement was temporary and was never tied to a restored ability to engage in substantial

gainful activity. *See Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir. 2011) ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce."). The ALJ noted that Plaintiff testified that he lost his last job in 2019 due to difficulties with concentration, "but did not mention any physical limitations performing the job." (Tr. 26.) This is not an entirely accurate characterization of Plaintiff's testimony: "I couldn't focus. I couldn't get the work done. I couldn't actually sit and get the job done. I couldn't physically do the work." (Tr. 85.) When asked at the beginning of the hearing why he was unable to work, Plaintiff testified that he was unable to concentrate or focus due to constant pain and side effects from medications. (Tr. 72.)

Plaintiff argues that the ALJ failed to evaluate Dr. Nenadovich's opinion pursuant to the factors set forth in 20 C.F.R. § 404.1527. The ALJ did not explain how the extensive treatment relationship between Dr. Nenadovich and Plaintiff was considered in weighing the opinion. *See* 20 C.F.R. § 404.1527(c)(1) ("Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)[.]"). Dr. Nenadovich noted that she treated him monthly (Tr. 2584), and the record reflects that their treatment relationship began on March 10, 2016. (Tr. 556.) *See* 20 C.F.R. § 404.1527(c)(1) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). The ALJ did not discuss whether, or how, he had considered the fact that Dr. Nenadovich performed Plaintiff's spinal surgery. (Tr. 596.) *See* 20 C.F.R. § 404.1527(c)(2)(ii) ("Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.").

11

The ALJ also failed to assess the evidence that Dr. Nenadovich provided in support of her opinion. *See* 20 C.F.R. § 404.1527(c)(3). Dr. Nenadovich cited objective signs, including: limitations in all planes of range of motion; abnormal gait; muscle spasms; muscle weakness; tenderness; and crepitus. (Tr. 2585.) The medical opinion is also supported by Dr. Nenadovich's treatment notes, which document: antalgic or slow gait; positive straight leg raising; pain with spinal range of motion; limited spinal range of motion; joint tenderness; reduced hip rotation; decreased right hand sensation; very slow movement from sitting to standing; positive right shoulder impingement; and positive O'Brien's and Jobe's tests. (Tr. 558, 562, 1713, 1728, 1738, 1796, 1824.) During appointments with Dr. Nenadovich, Plaintiff described: high levels of back, neck, and leg pain; numbness and tingling; neck pain that radiated into his right arm into his hand and fingers; weakness; difficulty walking; difficulty with activities of daily living; pain aggravated by walking, sitting, standing, and other physical activity; right arm and shoulder pain; constant discomfort; and dizziness. (Tr. 556, 560, 567, 588, 1726, 1735-36, 1769, 1796, 1822.)

The ALJ similarly neglected to assess the evidence that was consistent with Dr. Nenadovich's opinion. *See* 20 C.F.R. § 404.1527(c)(3). Other doctors noted: spinal tenderness; limited spinal range of motion; positive straight leg raising; slow movements; muscle spasms and tightness; positive right shoulder impingement; positive O'Brien's and Jobe's tests; limited shoulder range of motion; right elbow tenderness; slow gait; limited knee range of motion; positive Tinel's sign; right hand weakness; limited knee range of motion; absent reflexes in the right ankle; positive cervical compression tests; and positive Spurling's test. (Tr. 497, 513, 515, 517, 554, 578, 593, 1705, 1743, 1759, 1767, 1774, 1865, 1915, 2149, 2147, 2335-37, 2548.) Also, the ALJ did not articulate any consideration of Dr. Nenadovich's specialization. *See* 20 C.F.R. § 404.1527

12

(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."). As an orthopedic surgeon, Dr. Nenadovich had expertise in treating musculoskeletal conditions.

In response to Plaintiff's arguments, the Commissioner notes the ALJ's discussion of improvement in Plaintiff's walking abilities and evidence of normal gait. However, as discussed above, ample evidence in the record documented slow, unstable, antalgic, or abnormal gait. (Tr. 558, 578, 1703, 1713, 1728,1738, 1743, 1759, 1865, 1915, 2149, 2335, 2533, 2545.) The Commissioner also points to a single April 2019 appointment where Plaintiff had normal gait, strength, and sensation. However, as noted, the record frequently documented reduced strength, weakness, and decreased sensation throughout his body. (Tr. 553, 556, 564, 576, 583, 588, 560, 593, 600, 603, 654, 800, 857, 930, 1571, 1703, 1705, 1740, 1829, 1833, 1903, 1988, 2009, 2037, 2083, 2085, 2333, 2335.) The ALJ should have explained why the unfavorable evidence was more persuasive than the favorable evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888-89 (7th Cir. 2001). An ALJ errs by assessing only the evidence supporting his conclusion. *Denton v. Astrue*, 596 F.3d 419, 415 (7th Cir. 2010).

The Commissioner points to the ALJ's reliance on the pain relief Plaintiff experienced following the placement of a spinal cord stimulator. However, as Plaintiff notes, the record demonstrates that he continued to suffer severe pain following the placement of his spinal cord stimulator. (Tr. 72, 77, 2545.) The fact that his pain improved temporarily did not mean he was able to work. See *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014) ("The key is not whether one has improved . . . but whether they have improved enough to meet the legal criteria of not

13

being classified as disabled."). The ALJ and the Commissioner both fail to articulate how these few treatment records showing improved pain outweighed the evidence that supported and was consistent with Dr. Nenadovich's opinion.

Thus, the Commissioner has failed to demonstrate that the ALJ provided a "sound explanation" for rejecting Dr. Nenadovich's opinion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). The ALJ should have articulated what consideration he gave to the long, frequent treatment relationship between Plaintiff and Dr. Nenadovich, who performed his spinal surgery. 20 C.F.R. § 404.1527(c)(1)-(2). The ALJ was required to assess the objective findings that Dr. Nenadovich provided in support of her opinion, both on the opinion form and in her treatment notes. 20 C.F.R. § 404.1527(c)(3); (Tr. 558, 562, 1713, 1728, 1738, 1796, 1824, 2585.) The ALJ erred by failing to evaluate the evidence from other sources that was consistent with Dr. Nenadovich's opinion. 20 C.F.R. § 404.1527(c)(4); (Tr. 497, 513, 515, 517, 554, 578, 593, 1705, 1743, 1759, 1767, 1774, 1865, 1915, 2149, 2147, 2335-37, 2548.) Also, the ALJ neglected to articulate what consideration, if any, he gave to Dr. Nenadovich's specialization as an orthopedic surgeon. 20 C.F.R. § 404.1527(c)(5). Accordingly, due to these errors, remand is required for proper consideration of Dr. Nenadovich's opinion.

Plaintiff next argues that the ALJ failed to properly assess the 2018 opinion of Plaintiff's consultative examining psychologist, Craig Nordstrom, Psy.D. (Tr. 26, 2267-70.) Dr. Nordstrom opined that Plaintiff presented with "very significant and persistent nightmares, flashbacks and intrusive thoughts of horrific experiences from serving as a firefighter and emergency medical services technician." (AR 2270.) He had "significant anxiety" and presented as "quite irritable." (*Id.*) Plaintiff presented with a "fairly poor ability to sustain concentration," and a "significant

14

impairment of functioning in the area of social interaction due to irritability and social withdrawal."

(*Id*.) The ALJ afforded little weight to Dr. Nordstrom's 2018 opinion, because it was "not

consistent with the record." (Tr. 26.)  The ALJ found that Plaintiff's psychological testing – which

was required for his bariatric surgery – from June of 2018 showed only mild depressive and

attentiveness. (Tr. 26, 2243-44.) However, as discussed below, other evidence in the record was

consistent with Dr. Nordstrom's opinion.

Plaintiff argues that the ALJ erred by failing to evaluate Dr. Nordstrom's opinion pursuant

to the factors set forth in 20 C.F.R. § 404.1527. The ALJ did not discuss whether, or how, he

considered the fact that Dr. Nordstrom had the opportunity to examine Plaintiff twice, in 2016 and

2018. *See* 20 C.F.R. § 404.1527(c)(1). Dr. Nordstrom's examination notes supported his opinion

as well. *See* 20 C.F.R. § 404.1527(c)(3). Dr. Nordstrom observed that Plaintiff presented with a

blunt affect, and spoke only when he was required to respond to questions. (Tr. 2267.) Plaintiff

reported significant symptoms of PTSD, including intrusive thoughts, flashbacks, nightmares, and

visual hallucinations. (Tr. 2268.) He described diminished interest in activities. (*Id*.) Plaintiff

indicated feelings of detachment and distrust for others "all the time," and said that he did not like

people. (*Id*.) Dr. Nordstrom noted that Plaintiff presented as anhedonic and fatigued, with mild

irritability and a depressed mood. (*Id*.) Plaintiff reported: difficulty maintaining concentration;

feelings of hopelessness, helplessness, and worthlessness; daily thoughts of suicide; daily excessive

anxiety; and worsening depressive symptoms. (*Id*.) Dr. Nordstrom noted that Plaintiff's responses

were quite delayed at times. (Tr. 2270.) During the examination, Plaintiff reported an inability to

care for his personal needs, do chores, or manage his hygiene due to loss of motivation and

physical limitations. (*Id*.)

As Plaintiff notes, the ALJ did not assess the evidence that was consistent with Dr. Nordstrom's opinion. *See* 20 C.F.R. § 404.1527(c)(4). Dr. Nordstrom's 2018 opinion was consistent with his 2016 examination. During this examination, Plaintiff described similar symptoms to those in 2018, including: depressed mood nearly every day; insomnia; feelings of hopelessness, helplessness, and worthlessness; low energy; suicidal ideation; excessive anxiety; constant worry; and irritability. (Tr. 1698.) Dr. Nordstrom noted that Plaintiff presented with a dysthymic mood and flat affect. (Tr. 1699.) Other records were also consistent with Dr. Nordstrom's 2018 opinion. For example, Dr. Pithadia observed that Plaintiff presented with a sad affect. (Tr. 1705.) During his consultative examination with Dr. Gupta, Plaintiff reported poor concentration, nightmares, flashbacks, crying spells, difficulty sleeping, nervousness, anxiety, and social isolation. (Tr. 2333.) Plaintiff testified that he was unable to concentrate or focus due to constant pain. (Tr. 72.) His PTSD, anxiety, and mood problems had worsened, leaving him unable to "deal with people anymore." (*Id*.) He struggled to maintain concentration "all the time." (Tr. 79.)

The Commissioner responds by simply reiterating the ALJ's reasons for discounting Dr. Nordstrom's opinion.  The Commissioner points to a single treatment record from June of 2018 – the pre-surgical psychological evaluation for weight loss surgery – showing that Plaintiff was attentive with mild depression. (Tr. 2243-44.) However, Plaintiff has identified many more records that showed more significant mental symptoms, including: depressed mood; insomnia; feelings of hopelessness; helplessness, and worthlessness; low energy; suicidal ideation; excessive anxiety; constant worry; irritability; dysphoric mood; flat or sad affect; poor concentration; nightmares; crying spells; social isolation; and difficulty dealing with other people. (Tr. 72, 79, 1698-99, 1705,

16

2333.) The Commissioner also points to Dr. Nordstrom's note that Plaintiff only had mild irritability during the examination. (Tr. 2268.) However, Plaintiff also described feelings of detachment and distrust for others "all the time," as well as a dislike for others. (Tr. 2268.) These statements – in addition to the mild irritability Dr. Nordstrom personally observed - reasonably supported Dr. Nordstrom's conclusion that irritability and social isolation made it difficult for Plaintiff to maintain adequate social functioning during the workday. *See Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015) (recognizing that "psychiatric assessments normally are based primarily on what the patient tells the psychiatrist").

The Commissioner has failed to justify the ALJ's failure to evaluate Dr. Nordstrom's opinion pursuant to the factors set forth in 20 C.F.R. § 404.1527.  The ALJ did not discuss the examining relationship between Plaintiff and Dr. Nordstrom. 20 C.F.R. § 404.1527(c)(1). The ALJ neglected to address the observations and other evidence that Dr. Nordstrom provided in support of his opinion in his examination notes. (Tr. 2267-70.) 20 C.F.R. § 404.1527(c)(3). The ALJ erred by failing to discuss the evidence from other parts of the record – including Dr. Nordstrom's 2016 examination – that was consistent with Dr. Nordstrom's opinion. (Tr. 72, 79, 1698-99, 1705, 2333.) 20 C.F.R. § 404.1527(c)(4). Thus, remand is warranted for a proper consideration of Dr. Nordstrom's opinion, consistent with the regulations.

Next, Plaintiff argues that the ALJ failed to properly evaluate his physical RFC.  In the RFC assessment, ALJs must provide "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence[.]" SSR 96-8p. *See also Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009) ("The ALJ . . . must build a logical bridge from evidence to conclusion. If the Commissioner's decision lacks adequate discussion of

the issues, it will be remanded."). As noted above, the ALJ found that Plaintiff could perform

sedentary work, with the following additional postural and manipulative limitations: occasionally

reaching overhead with both upper extremities; frequently reaching in all directions with both

upper extremities; frequently handling with both upper extremities; no climbing of ladders, ropes,

and scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping kneeling;

and no crawling or crouching. (Tr. 19-20.) Further, Plaintiff must be allowed to shift positions

every 20 minutes, or alternate between sitting and standing for 1-2 minutes at a time while

remaining on task. (Tr. 20.) Plaintiff claims that the ALJ did not explain what evidence supported

this RFC finding and simply provided a summary of the evidence without connecting the dots

between the evidence and the conclusions. (Tr. 20-24.) *See Diaz v. Chater*, 55 F.3d 300, 307 (7th

Cir. 1995) ("An ALJ . . . must articulate, at some minimum level, his analysis of the evidence to

allow the appellate court to trace the path of his reasoning.").

      Plaintiff contends that the ALJ did not explain how he determined that Plaintiff would be

able to remain on-task while shifting between sitting and standing. (Tr. 20.) Plaintiff notes that the

record reflects that he would struggle to alternate between positions quickly and efficiently. For

example, Dr. Nenadovich observed on two occasions that Plaintiff was "very slow from sitting to

standing." (Tr. 1796, 1824.) Dr. Gupta observed that Plaintiff was "able to stand from a sitting

position with difficulty." (Tr. 2335.) Dr. Pithadia wrote that all of Plaintiff's movements were

"slow," and that he had difficulty getting up from a chair and was "unable to stand up from a

sitting down position." (Tr. 1704-05.) Plaintiff points out that the ALJ did not acknowledge this

evidence, which directly contradicted the ALJ's conclusion that Plaintiff would be able to remain

on-task while shifting positions. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)

("Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected.").

Plaintiff also suffered from poor concentration due to his depression and anxiety, and was often fatigued. (Tr. 72, 79, 936, 1485, 1794, 2268, 2270, 2334.) Plaintiff argues that his poor concentration and fatigue, in concert with his high pain levels and difficulty with movement, could have caused him to be excessively off-task. The VE testified that an individual could shift positions at will in these jobs, but would need to remain on task. (Tr. 90.) Plaintiff contends that with no discussion from the ALJ, it remains uncertain whether Plaintiff could actually sustain work as an addressing clerk, document preparer, or touch-up screener, and thus the ALJ's conclusion that Plaintiff could remain on task while alternating between sitting and standing was not supported by substantial evidence. *See Biestek v. Berryhill*, 139 S. Ct. 1148 (2019) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").  As Plaintiff's arguments are well-taken, remand is appropriate on the issue of Plaintiff's physical RFC assessment, as it pertains to Plaintiff's ability to remain on task.

Plaintiff further argues that the ALJ also failed to explain how Plaintiff could perform occasional reaching overhead with both extremities, with frequent reaching in all other directions and frequent handling. The ALJ found that Plaintiff's horizontal tear of the labrum of his right shoulder with atrophy was a severe impairment. (Tr. 17-18.) The record shows that Plaintiff presented for treatment of neck pain, as well as pain and weakness in his right shoulder, arm, elbow, and hand. (Tr. 553, 556, 583, 1736, 2037.) As noted above, doctors observed: elbow tenderness and pain; hand pain; positive right shoulder impingement; positive O'Brien's test; positive Jobe's test; positive Tinel's sign; decreased sensation in his right hand; limited right

19

shoulder range of motion and strength; and limited cervical range of motion. (Tr. 554, 593, 1705,

1733, 1738, 1767, 1774.) Plaintiff described numbness and tingling into his right hand that caused

difficulty gripping. (Tr. 583, 2333.) Dr. Pithadia observed weakness in Plaintiff's right hand upon

dynamometer testing. (Tr. 1705.) A July 2016 MRI of Plaintiff's right shoulder revealed:

supraspinatus tendinosis; an extensive horizontal tear of the posterior labrum; moderate AC joint

hypertrophic changes, with mild reactive edema at the joint; and moderate fatty atrophy. (Tr.

1843.)  Plaintiff also suffered from carpal tunnel in his left hand that caused weakness, constant

pain, and tingling in his wrist. (Tr. 78-79.) Treating physician Thomas Ryan, D.O., opined that

Plaintiff was limited in his ability to reach and handle due to shoulder impingement, a rotator cuff

tear, cervical degenerative disease, and stenosis. (Tr. 2141.)  Plaintiff concludes that, given this

evidence, it is unclear if Plaintiff would be physically capable of sustaining occasional overhead

reaching, with frequent reaching in all other directions and frequent handling, and that the ALJ's

summary of the evidence did not provide sufficient justification for the RFC. *See Hollingsworth v.

Saul*, 2020 WL 2731008, at *2 (N.D. Ind. May 26, 2020) ("A summary of the evidence isn't the

same thing as meaningful analysis.").

In light of the evidence recited by Plaintiff, the ALJ was obligated to articulate how he

found that Plaintiff could sustain occasional overhead reaching, frequent reaching in all other

directions, and frequent handling at the full-time competitive level. *See Scott v. Barnhart*, 297 F.3d

589, 595 (7th Cir. 2002). As the ALJ failed to do so, remand is warranted.

Plaintiff also notes errors in the ALJ's discussion (or lack of it) regarding his obesity.

Throughout much of the relevant time period, Plaintiff was significantly obese, with a BMI of

between 45 and 50. (Tr. 968, 1742, 2094.) The ALJ found that Plaintiff's obesity was a severe

impairment, and noted that his "slow, wide-based gait [was] related to his obesity," and had been incorporated into the RFC. (Tr. 18.) Otherwise, the ALJ offered no explanation as to how the obesity was factored into the RFC assessment. *See* SSR 19-2p*; Getch v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012) ("An ALJ must factor in obesity when determining the aggregate impact of an applicant's impairments."). The record shows that Plaintiff suffered from significant pain in his back, right leg, and right knee that interfered with his ability to sit, stand, and walk. (Tr. 77, 80, 512, 560, 583, 1703, 1726, 1740.) Clearly, Plaintiff's obesity would exacerbate the effects of his degenerative disc disease and right knee problems. *See e.g.*, SSR 19-2; *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir.) *on reh'g*, 368 F.3d 691 (7th Cir. 2004) ("Even if Barrett's arthritis was not particularly serious in itself, it would interact with her obesity to make standing for two hours at a time more painful than it would be for a person who was either as obese as she or as arthritic as she but not both."). An ALJ errs where he fails to consider the combined impact of a claimant's impairments. *See Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003).

Here, the ALJ offered no explanation as to how Plaintiff's obesity was factored into the RFC assessment, aside from noting that his obesity was severe and writing that his "slow, wide-based gait" had been incorporated into the RFC assessment. The Commissioner's own Ruling states that the ALJ must explain their analysis of the claimant's obesity and offer a discussion of how their obesity impacts their ability to perform exertional functions, such as standing, walking, lifting, and carrying. SSR 19-2p. This Ruling also makes it clear that ALJs must evaluate the effects of obesity on a claimant's ability to work in concert with their other impairments. (*Id.*) Plaintiff had degenerative disc disease in his cervical, thoracic, and lumbar spine, as well as chondral loss of the right knee. (Tr. 17-18.) These impairments caused back pain,

leg pain, and knee pain that diminished his ability to sit, stand, and walk. (Tr. 77, 80, 512, 560,

583, 1703, 1726, 1740.) As such, the ALJ was obligated to provide an analysis of how Plaintiff's

significant obesity would impact his other impairments and affect his ability to carry out work

tasks. *See Martinez v. Astrue*, 630 F.3d 693, 698-99 (7th Cir. 2011) ("It is one thing to have a bad

knee; it is another thing to have a bad knee supporting a body mass index in excess of 40. We

repeat our earlier reminder that an applicant's disabilities must be considered in the aggregate.").

Again, the Commissioner has not shown that the ALJ provided any real analysis of Plaintiff's

obesity. Due to this error in the decision, remand is required.

Plaintiff next claims that the ALJ improperly found he could occasionally stoop, as he often

presented with significantly limited forward flexion. Dr. Gupta noted that Plaintiff's lumbar flexion

was between 40 and 50 degrees, out of 90 possible degrees. (Tr. 2337.) Dr. Thomas observed that

Plaintiff  could flex forward to only 40 degrees. (AR 2149.) Other doctors noted deficits in

Plaintiff's ability to perform forward flexion. (Tr. 562, 578, 1742, 1759, 1865, 1915.) Yet, the

ALJ found that Plaintiff could occasionally stoop. (Tr. 20.) The Seventh Circuit has recognized

that there is a conflict between 50 degrees of flexion or less, and the ability to stoop occasionally,

or up to one-third of the workday. *See Thomas v. Colvin*, 534 Fed.Appx. 546, 551 (7th Cir.

2013); *Golembiewski* at 917.  This error requires remand, as Plaintiff would need to bend at the

waist (stoop) occasionally in order to perform light work as the ALJ described.

Next, Plaintiff argues that the ALJ failed to properly evaluate his mental RFC.  The ALJ

found that Plaintiff's's depression, anxiety, and PTSD were severe impairments. (Tr. 17-18.) The

ALJ found that Plaintiff was moderately limited in his ability to maintain concentration,

persistence, and pace. (Tr. 19.) The RFC assessment eliminated assembly line work or strictly

enforced daily production quotas. (Tr. 20.) Plaintiff contends, however, that the ALJ failed to explain how these restrictions would accommodate Plaintiff's problems with concentration, persistence, and pace. The Seventh Circuit has consistently held that the ALJ's RFC assessment, and the hypothetical question posed to the VE, "must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). *See also O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010); *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 473-74 (7th Cir. 2004).

Plaintiff testified that he was unable to concentrate or focus because of constant pain. (Tr. 72.) He described difficulty with concentration "all the time." (Tr. 79.) His medications made him dizzy, foggy, tired, drowsy, and loopy. (Tr. 72, 78, 82-83.) Plaintiff was terminated from his last job due to an inability to focus. (Tr. 85.) He made similar reports at his first hearing. (Tr. 112.) In his Function Report, he wrote that concentrating and completing tasks was difficult due to his pain medications. (Tr. 381.) He could pay attention for only half an hour. (*Id*.) He did not participate in activities because it was "difficult to get around and painful." (Tr. 381.) Plaintiff's wife made similar statements in her Third Party Function Report. (Tr. 394.) During his second consultative examination with Dr. Nordstrom, he described: difficulty maintaining concentration; intrusive thoughts; flashbacks; diminished interest; irritability; daily suicidal thoughts; and daily excessive anxiety. (Tr. 2268.) Dr. Nordstrom concluded that he presented with a "fairly poor ability to sustain concentration." (Tr. 2270.) In addition, Plaintiff suffered from high levels of pain and often presented with low energy or fatigue. (Tr. 517, 556, 576, 583, 873, 907, 936, 1698, 1740, 1757, 1822, 1863, 2146, 2268, 2330, 2334.) Doctors observed that he moved slowly. (Tr. 517, 578, 1704, 1713, 1738, 1743, 1786, 1824.) Dr. Nenadovich opined that Plaintiff would need

23

unscheduled breaks and would be off-task 25 percent or more during the workday. (Tr. 2586, 2587.) Plaintiff argues that, taken together, this evidence reflects that Plaintiff would require additional breaks during the workday to manage his symptoms, as well as additional time to complete tasks. Plaintiff maintains that if he struggled to concentrate, moved slowly due to pain, and was fatigued, he would be unable to complete work tasks efficiently, even in a work environment that did not require assembly line work or strictly enforced daily production quotas. Plaintiff contends that the ALJ should have explained how these limitations would be sufficient, given the contrary evidence. *See Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (ALJs "must build an accurate and logical bridge" from the evidence to their conclusions).

Clearly, the evidence recited by Plaintiff reflects the likelihood that Plaintiff would need additional breaks during the day to manage his pain and fatigue, and extra time to complete work tasks due to slow movements, fatigue, and psychological symptoms. Considering this evidence, the ALJ was obligated to provide some explanation as to how the elimination of assembly line work or strictly enforced daily production quotas would accommodate Plaintiff's moderate restriction in his ability to sustain concentration, persistence, and pace. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

The ALJ also found that Plaintiff was moderately limited in his ability to interact with others. (Tr. 19.) The ALJ concluded that Plaintiff could not interact with the general public, but could occasionally interact with coworkers and supervisors. (Tr. 20.) Again, Plaintiff argues that the ALJ failed to articulate how these RFC limitations accounted for Plaintiff's social limitations and claims that the record reflects that more extensive social limitations were warranted. Plaintiff testified that he was unable to work due to an inability to "deal with" others due to his PTSD,

24

anxiety, and mood problems. (Tr. 72.) He acknowledged having problems being around others,

and felt paranoid. (Tr. 83.) He had a short temper, avoided crowds, and spent most of his time

alone. (*Id.*) His wife reported that he was difficult to deal with due to irritability. (Tr. 83, 2268.)

She told Dr. Nordstrom: "We all tiptoe around him – me, his mom and his kids. We call cater to

make sure we don't make things worse. If things get bad, he goes downstairs to his room to watch

TV." (Tr. 2270.) Dr. Nordstrom concluded that Plaintiff had a "significant impairment of

functioning in the area of social functioning due to irritability and social withdrawal." (*Id.*) Plaintiff

concludes that, given this evidence, the ALJ was required to articulate how Plaintiff would be able

to sustain occasional interaction with coworkers and supervisors. *See Briscoe*, 425 F.3d at 351.

This Court agrees that the ALJ should have articulated how the evidence led to a

conclusion that Plaintiff could interact occasionally with supervisors and co-workers at the

full-time, competitive level. *See* SSR 96-8p; *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

Accordingly, remand is appropriate.

Next, Plaintiff argues that the ALJ did not adequately evaluate his symptoms. ALJs should

evaluate a claimant's activities of daily living. *See* SSR 16-3p; 20 C.F.R. § 404.1529(c)(3)(i). In

finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects" of his

symptoms were "not entirely consistent" with the record, the ALJ summarized some of his

activities, including: visiting with family and friends from church; trying to walk laps during the

day; taking care of his personal needs with some assistance; shopping independently; caring for his

children; and cooking simple meals. (Tr. 24.) Plaintiff points out that the ALJ did not offer any

explanation as to whether or how these activities contradicted Plaintiff's reported symptoms and

limitations. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Plaintiff contends that these

activities, on their own, do not reflect that he could perform full-time work, as he was able to perform these activities on his own schedule, with assistance from others, with frequent breaks, and without having to meet workplace standards. The Seventh Circuit has consistently held that there are "critical differences" between basic activities of daily living and the activities required for full-time, competitive employment. "The critical differences between activities of daily living and activities in a full-time job are that a person as more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance[.]" *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). *See also Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office.").

Plaintiff further points out that the ALJ did not acknowledge the many difficulties that Plaintiff had in carrying out his activities of daily living. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) ("An ALJ cannot disregard a claimant's limitations in performing household activities."); *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008). Plaintiff frequently described struggling to carry out his daily tasks due to pain. (Tr. 560, 576, 583, 1699, 1740, 1757, 1863, 2545.) Plaintiff reported that he was unable to care for his personal needs and hygiene due to low motivation and physical limitations. (Tr. 2270.) He needed help from his wife with dressing and putting on his shoes. (Tr. 583.) Bathing was painful. (*Id.*) He was unable to cook, vacuum, do dishes, or wash clothes. (Tr. 1699, 2270.) While he was able to shop, he had to use a motorized cart and have assistance with loading and unloading items. (Tr. 1699.) He testified that more than half of the days, he was unable to leave the house due to his pain. (Tr. 82.) These restrictions were

consistent with Plaintiff's reported intense pain, weakness, and fatigue, and should have been discussed by the ALJ. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).

ALJs should consider the treatment methods, including medication, that a claimant pursues to relieve his symptoms. *See* SSR 16-3p; 20 C.F.R. § 404.1529(c)(3)(iv)- (v). Plaintiff's medications included: Morphine; Fentanyl; Hydrocodone; Dilaudid; Oxycodone; Xanax; Cyclobenzaprine; Gabapentin; Norco; Tramadol; Ambien; Celexa; Carisoprodol; and Trazodone. (Tr. 362, 928-29, 1829.) The ALJ mentioned that Plaintiff took medication, (Tr. 18, 20, 21, 22, 23, 24), but noted that his medications "managed his back pain at times," or improved his symptoms. (Tr. 24, 25.) However, the ALJ did not acknowledge that Plaintiff often reported that his medications were not effective at managing his pain. (Tr. 576, 579, 1015, 1231, 1697, 2059.)

The ALJ also did not evaluate the evidence showing that Plaintiff's other attempts at relieving his pain – which included physical therapy, injections, use of a TENS unit – were not always successful. (Tr. 515, 517, 576, 588, 1757, 1769, 2533.) Plaintiff underwent a spinal surgery in April of 2016 that included a lumbar laminectomy with facetectomy and foraminotomy to decompress the L5 nerve root, a posterior fusion at L5-S1, and a left T11 laminectomy to decompress the central canal and left T12 nerve root, with a partial facetectomy. (Tr. 596.) In August of 2019, Plaintiff underwent the placement of an intrathecal morphine pump. (Tr. 2471.) He continued to report high levels of pain following these procedures. (Tr. 72, 77, 1703-04, 1793, 1822, 1863, 2333, 2533, 2545.)

Moreover, the ALJ failed to explain if, or how, he considered the significance of the kinds of medication that Plaintiff was prescribed. The Seventh Circuit has recognized that a claimant who is willing to undergo serious treatment – including surgery and strong prescription medication

27

– "indicates that the claimant's complaints of pain are likely credible." *Scrogham v. Colvin*, 765

F.3d 685, 701 (7th Cir. 2014) (citing *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004)).

The ALJ should have explained why Plaintiff's extensive course of treatment did not support his

allegations of disabling pain. *See* SSR 16-3p ("Persistent attempts to obtain relief of symptoms,

such as increasing dosages and changing medications, trying a variety of treatments . . . may be an

indication that an individual's symptoms are a source of distress and may show that they are

intense and persistent."); *Murphy v. Berryhill*, 2019 WL 1123511, at *16 (N.D. Ind. Mar. 11,

2019) (faulting the ALJ who "did not explain why Plaintiff's use of narcotic pain medications,

treatment with specialists, and use of a TENS device did not further support her allegations of

disabling pain and symptoms").

      ALJs should also assess any side effects that a claimant experiences due to medication. *See*

SSR 16-3p; 20 C.F.R. § 404.1529(c)(3)(iv). Plaintiff testified that his medications caused

dizziness, fogginess, difficulty with communication, fatigue, insomnia, and incontinence. (Tr.

82-83.) The ALJ acknowledged Plaintiff's testimony, but said that there was "no mention of any

side effects in the record." (Tr. 24.) This is not entirely accurate, as Plaintiff reported drowsiness,

fatigue, incontinence, difficulty sleeping, and dizziness to doctors and physical therapists. (Tr. 496,

583, 936, 1703, 1704, 1725, 1875, 1883, 1901, 2051, 2084, 2243, 2334, 2531, 2533, 2545,

2571.) While he denied side effects on some occasions (Tr. 1697), the Seventh Circuit has held

that a claimant's failure to report side effects does not mean that he does not experience them.

*Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). In any event, the ALJ seemed to credit

Plaintiff's reported side effects later in the decision, writing that he included "postural and hazard

restrictions because of side effects from medication, including dizziness and drowsiness." (Tr. 25.)

Yet, the ALJ offered no explanation as to how these RFC limitations would accommodate Plaintiff's drowsiness and dizziness from medication. *See Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (ALJs must "build an accurate and logical bridge" from the evidence to the conclusion). While the ALJ was not required to fully credit Plaintiff's testimony, he was required to provide an analysis of how these side effects would affect his ability to work. *See e.g., Jayson J. v. Saul*, 2020 WL 597657, at *17 (N.D. Ind. Feb. 7, 2020).

Accordingly, for all the above reasons, the decision will be remanded.

Conclusion

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED AND REMANDED for further proceedings consistent with this Opinion.

Entered: November 10, 2021.

s/ William C.  Lee
William C. Lee, Judge
United States District Court